UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
RONALD WAHL,

                               Plaintiff,        **REPORT AND**
                                                               **RECOMMENDATION**
        -against-                                  **CV 09-1272 (SJF)(ARL)**

THE COUNTY OF SUFFOLK, et al.,

                               Defendants.
----------------------------------------------------------------X

**LINDSAY, Magistrate Judge:**

       Before the court, on referral from District Judge Sandra J. Feuerstein, is the motion for summary judgment of the defendants, the County of Suffolk, the Suffolk County Police Department, Commissioner Richard Dormer, Deputy Police Commissioner Roger Shannon, Inspector Robert Cassagne, Lieutenant Dennis Sullivan, Lieutenant Stephen Hernandez, Captain Paul Ryan, and Deputy Inspector Edward Brady (collectively "the defendants"), pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth herein, the court recommends that the defendants' motion to be granted.

                                          **BACKGROUND**

       On July 14, 1986, the plaintiff, Ronald Wahl ("Wahl"), was hired by the defendant Suffolk County Police Department and was assigned to the Second Precinct. Defs. 56.1 Statement at ¶1.[1] On December 20, 1999, Wahl's wife gave birth to a child. Pl. Mem. at 1; Termini Aff. at Ex. B. On January 14, 2000, Wahl sent his then Commanding Officer, Lieutenant Petrowski, a request to take maternity leave with such leave to be deducted from his

---

[1] The facts set forth in the defendants' 56.1 statement have all been admitted to by the plaintiff.

accrued sick leave. Defs. 56.1 Statement at ¶2. Wahl was advised that maternity leave was only available to pregnant female officers, but that he was eligible to take child care leave under the Collective Bargaining Agreement ("CBA") or leave under the Family Medical Leave Act (FMLA). *See* Termini Aff. at Ex. C. Under the CBA, as well as the Rules and Procedures of the Police Department, pregnant female officers are permitted to take up to nine months leave after birth and charge such leave to any accrued sick time.[2] The CBA also permits a parent to take up to nine months child care leave but such leave cannot be charged to accrued sick or vacation time. Termini Aff. at Ex. V. Under the FMLA, 29 U.S.C. § 2601, as enacted by Congress, Wahl had the right to take up to twelve weeks of leave and charge this leave to any accrued vacation time. Wahl sent an internal memorandum to Chief Monteith stating that the leave was necessary because doctors had advised him that for three months his child could not be in contact with anyone who had a cold or had been exposed to a cold. Defs. 56.1 Statement at ¶2, Termini Aff. at Ex. C. Wahl further stated in the memorandum that he felt that the practice of limiting maternity leave to female officers was discriminatory essentially because women were permitted to charge this leave to sick time. *Id.*

There are no factual allegations occurring between February 2000 and April 2005, however, from April 2005 to November 3, 2006, Wahl had to be counseled three times regarding his abuse of sick time and was warned that his use of sick time would be monitored. Defs. 56.1 Statement at ¶¶ 5, 6, 7, 10; Termini Aff. at Ex. E, F, G, I. In February 2007, Wahl was transferred to the First Precinct because of his excessive absences where, at his request, he was

---

[2]The court notes that the maternity leave policy permits pregnant employees to use sick leave, vacation, personal days or compensatory time but Wahl only addresses the right to use sick time during maternity leave.

assigned to the "steady ten hour night tour schedule." Defs. 56.1 Statement at ¶8; Termini Aff. at Ex. L at 4. Despite receiving three prior admonitions concerning sick time abuse, Wahl took seventeen sick days from January 1, 2007 to February 14, 2007 and was counseled a fourth time regarding his use of sick time. *See* Termini Aff. at Ex. I. In a Sick Time Counseling Report, the reporting supervisor noted that Wahl would be required to present a doctor's certificate upon reporting back to duty. Wahl's request for two hours of overtime involved in obtaining the doctor's note was denied. *Id.* From February 1, 2007 through February 28, 2007, Wahl worked seven days and took seven sick days. Defs. 56.1 Statement at ¶9.

On March 12, 2007, Wahl's wife gave birth to their third child. Defs. 56.1 Statement at ¶13. On March 14, 2007, despite previously having been advised that maternity leave was not available to men, Wahl again submitted a request for maternity leave with such time to be deducted from his accrued sick time. Defs. 56.1 Statement at ¶14. The internal memorandum he sent stated:

> The undersigned's wife gave birth to our third child on 03/12/07. The undersigned respectfully requests to be granted a maternity leave effective immediately and ending on 09/05/07. Said leave to be deducted from the undersigned's accrued sick leave.
> The current policy allows female employees to take an additional seven months after most women are medically cleared to return to work.
> The undersigned is requesting a leave of less than six months.
> The undersigned feels the current policy is discriminatory against male employees. If said request is not granted, the undersigned believes he will have been a victim of gender discrimination.

Termini Aff. at Ex. K. On March 16, 2007, Lieutenant Dennis Sullivan advised Wahl's

commanding officer at the First Precinct that he had spoken to Wahl and had told him that he did not qualify for a maternity leave under the CBA but that he could take a child care leave up to nine months. Defs. 56.1 Statement at ¶14, Termini Aff. at Ex. M. Lieutenant Sullivan's correspondence was sent to the Chief of Patrol who formally denied Wahl's request for maternity leave. *Id.* Wahl was advised of the denial through an internal correspondence from Deputy Inspector Edward Brady date March 28, 2007. Defs. 56.1 Statement at ¶18; Termini Aff. at Ex. O.

In the meantime, Wahl's pattern of sick time abuse continued. From March 1, 2007 to March 18, 2007 he worked three and one-half days and took four sick days. Defs. 56.1 Statement at ¶11. On March 19, 2007, Wahl was transferred from steady night tours, back to a two-tour day/evening schedule, which had previously been his assignment.[3] *See* Defs. 56.1 Statement at ¶12. Wahl immediately commenced a grievance proceeding pursuant to Section 19(c)(5) of the CBA which provides that an "Involuntary transfer of a police officer from one command to another or one schedule to another from within the command shall not be done in an arbitrary and capricious manner." Defs. 56.1 Statement at ¶15; Termini Aff. at Ex. L.

On April 9, 2008, an arbitration hearing was held between the PBA and the County to address Wahl's grievance concerning his transfer and schedule change. The County argued that while the transfer stemmed from his persistent and excessive absences, it was intended to improve his attendance not to discipline him. In finding that the decision to reassign Wahl was

---

[3] At the time of the transfer, Wahl had been working at the Fourth Precinct and was a assigned to the "two-tour schedule." Termini Aff. at Ex. K at 2. The two-tour schedule is "one set of five (5) consecutive day tours (7 a.m. - 3:00 p.m.), followed by one set of five (5) consecutive evening tours (3:00 p.m. - 11:00 p.m.). The steady night tour schedule is four (4) consecutive ten (10) hour tours (9:00 p.m. - 7 a.m.). Termini Aff. at Ex. K at 2.

4

not arbitrary or capricious, Arbitrator Tillem noted:

> Inspector Robert Cassagne, . . . transferred grievant to the two tour shift from steady nights for two reasons: the two tour shift has more posts with more cops so the absence of one cop creates a gap easier to fill than it would be on the steady night tour. And he surmised that a change of supervisors with more of them and a different set of fellow officers might motivate grievant to improve his attendance. What Inspector Cassagne did does not sound unreasonable. In fact, it sounds like what any supervisor might attempt when confronted with an attendance record as abysmal as grievant's. . . .
>
> Or put another way, confronted with a seemingly incorrigibly absent employee, can it be said that Inspector Cassagne's transfer of grievant was arbitrary and capricious?

Termini Aff. at Ex. L.

Shortly after the shift reassignment and several months before the arbitration, Lieutenant Stephen Hernandez, an Internal Affairs Officer, initiated an administrative investigation of Wahl for potential sick time abuse. Defs. 56.1 Statement at ¶19; Termini Aff. at Ex. P. Pursuant to the investigation, Hernandez interviewed Wahl who acknowledged that he had called in sick 47 ½ days in 2007. Wahl stated that being bounced from precinct to precinct, the change in tours, and the new baby added stress and gave him headaches.[4] Termini Aff. at Ex. R. Wahl further indicated that he had not seen a doctor for his complaints and was not using the sick time for child care issues. Defs. 56.1 Statement at ¶21, Termini Aff. at Ex. R.

At the conclusion of the investigation, Wahl was served with a Notice of Charges and Specifications for conduct unbecoming an officer in that his use of sick time was excessive and

---

[4]During the interview, Wahl described a cranialplasty that had been performed when he was fourteen in response to a question about being under a doctor's care, but he then stated that the cranialplasty was unrelated to the headaches he was calling in sick for. Termini Aff. at Ex. R.

5

unjustified. Defs. 56.1 Statement at ¶22, Termini Aff. at Ex. S. Lieutenant Hernandez's report revealed that from March through June 2007, Wahl was scheduled to work 76 days and called in sick 41 times or 54% of the time, used sick family leave twice or 3% of the time, used 8 vacation days, representing 11% of his scheduled work time, and took 3 extra days off. Termini Aff. at Ex. Q. As a result, Wahl had only worked 28% of his assigned tour during four of the six months that he had hoped to take for maternity leave. *Id.* Hernandez also noted that Wahl managed never to take more than 3 consecutive sick days thereby avoiding the CBA requirement that he obtain a doctor's note for his absences. Wahl was suspended without pay on August 9, 2007. Termini Aff. at Ex. T.

On June 13, 2008, a second arbitration hearing was held to challenge the disciplinary charges imposed against Wahl. Defs. 56.1 Statement at ¶23, Termini Aff. at Ex. T. Arbitrator Light found Wahl guilty of the disciplinary charges and determined that he would be suspended without pay until October 31, 2008. *Id.* In November, Wahl received a ruling ending his suspension but received only five hours of notice that he was to return to active duty. *See* Wahl Aff. at ¶29. Wahl never returned to work and retired. Defs. 56.1 Statement at ¶23.

Wahl filed the instant complaint on March 29, 2009, alleging violations of the First and Fourteenth Amendments. Specifically, Wahl alleges that he was subjected to a discriminatory maternity leave policy that provides benefits to women but not to men and to First Amendment retaliation when he complained of the discriminatory policy. Wahl also contends that the defendants interfered with his rights under the Family Medical Leave Act and retaliated against him for requesting leave.[5] The defendants seek to dismiss all of the claims pursuant to Fed. R.

---

[5]Wahl has withdrawn his claims under the New York State Human Rights Law.

Civ. P. 56.

## DISCUSSION

A.   **Summary Judgment Standards**

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.L.P.*, 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party.  *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998).   If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable.  *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996), *cert denied,* 520 US 1228 (1997).

The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'"  *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994).  When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim."  *Jamaica Ash & Rubbish*, 85 F. Supp. 2d at 180 (quoting *Celotex,* 477 U.S. at

322). A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999). With these standards in mind, the court addresses the plaintiff's claim.

B.  **Wahl's Section 1983 Gender Discrimination Claim**

Wahl contends that the defendants have deprived him of his Fourteenth Amendment right to Equal Protection in violation of 42 U.S.C. § 1983. Specifically, Wahl argues that the police department's maternity leave policy, which permits pregnant officers to charge their leave to accrued sick time, is discriminatory. He contends that the policy is based on invalid stereotypes related to the role of men and women in our society and is not attributable to any legitimate different physical needs. For a number of reasons, Wahl's claim must fail.

**1. The Maternity Leave Provision**

To begin with, the essence of Wahl's complaint is his dissatisfaction with the child care benefits negotiated by the union. The Child Care Leave policy, which is available to all parents provides:

> A child care leave shall be granted upon application in accordance with these guidelines to a natural or adoptive parent of either sex . . . Child care leave may be granted for up to nine months.[6] No employee shall be permitted to use any type of leave accruals during a child care leave falling within the time period for which

---

[6] The maximum nine month leave is granted when the age of the child at the start of the leave is "Birth to two months." Termini Aff. at Ex. V at App. C.

they have been granted a child care leave.[7]

Termini Aff. at Ex. V at App. C., 64. In comparison, the maternity leave policy, which is available only to pregnant women, provides:

> A female police officer . . . shall be granted maternity leave of eighteen (18) months duration from the date of pregnancy. This leave shall be no longer than nine (9) months after the birth of a child. . . . A doctor, either employed by or preforming contract services for the County or the Police Department, shall upon request by the Medical Evaluation Unit, consult with the employee's physician to determine when the employee is no longer able to perform her duties. The employee, at her sole discretion, may use sick leave, vacation, personal days or compensatory time before being taken off the payroll.

Termini Aff. at V at 29.

"The NLRA governs federal labor-relations law. As permitted by statute, respondents designate[] the Union as their 'exclusive representativ[e] . . . for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment.' As the employees' exclusive bargaining representative, the Union 'enjoys broad authority . . . in the negotiation and administration of [the] collective bargaining contract." *14 Penn Plaza LLC v. Pyett,* 129 S. Ct. 1456, 1463 (2009). Here, the County and the PBA "collectively bargained in good faith and agreed," that after childbirth, both men and women would be granted up to nine months leave but postpartum women would be given a preferential benefit in that they would be able to use accrued sick time before being taken off the payroll. *See id.* "These freely negotiated terms" between the County and the PBA "qualif[y] as 'condition[s] of employment that [are] subject to mandatory bargaining under [the NRLA]" and "[c]ourts

---

[7]Under the Family Medical Leave Act, an employee may deduct twelve weeks from his unused vacation time.

generally may not interfere in this bargained-for exchange." *Id.* at 1463-64 ("Judicial nullification of contractual concessions . . . is contrary to what the Court has recognized as one of the fundamental policies of the National Labor Relations Act). Accordingly, there is no legal basis to strike this freely negotiated provision.

**2. Failure to Exhaust**

The defendants argue that, pursuant to the CBA, Wahl was mandated to challenge the denial of maternity leave through the grievance procedure. Termini Aff. at Ex. V at 34. The court disagrees. The CBA provides that "in order to establish a more harmonious and cooperative relationship between the County and the Employees, and to avoid and resolve disputes involving alleged violations of the terms of this Agreement, it is the purpose of this provision of this Agreement, to provide for the settlement of differences through an orderly grievance procedure." As an initial matter, the allegations herein are not that the CBA was being violated, they were in fact being implemented. More importantly, in order to compel the arbitration of discrimination claims of this type, the CBA must clearly and unmistakably reflect this requirement. It does not. *See 14 Penn Plaza LLC,* 129 S. Ct. at 1474 (CBA must clearly and unmistakably require union members to arbitrate discrimination claims). Thus, the court finds that Wahl was not required to exhaust his administrative remedies prior to commencing this action.

**3. The Constitutionality of the Provision**

Section 1983 provides a civil cause of action for damages against any person who, acting under the color of law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States. *See* 42 U.S.C. §1983.[8] The defendants do not

---

[8] Wahl has named Commissioner Richard Dormer, Deputy Police Commissioner Roger Shannon, Inspector Robert Cassagne, Lieutenant Dennis Sullivan, Lieutenant Stephen

dispute that they acted under color of law; rather, they argue that Wahl has provided no evidence that he have been deprived of any constitutional right.

Because the maternity policy allegedly discriminates against men, it is subject to scrutiny under the Equal Protection Clause. The Equal Protection Clause of the Fourteenth Amendment guarantees "'[ the] right to be free from invidious discrimination in statutory classifications and other governmental activity'." *Bernheim,* 79 F.3d 318, 323 (2d Cir. 1996)(quoting *Harris v. McRae*, 448 U.S. 297, 322 (1980)). "The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). Thus, "[a]n equal protection claim has two essential elements: (1) the plaintiff was treated differently than others similarly situated, and (2) this differential treatment was motivated by an intent to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Lovell v. Comsewogue Sch. Dist.*, 214 F. Supp. 2d 319, 321-22 (E.D.N.Y. 2002) (citing *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)); *see Humphrey v. County of Nassau*, No. 06-CV-3682 (JFB) (AKT), 2009 WL 875534, at *17 (E.D.N.Y. Mar. 30, 2009).

Here, the defendants acknowledge that maternity leave is a benefit conferred only on pregnant female officers. Thus, the court must determine whether there was an "exceedingly

---

Hernandez, Captain Paul Ryan, and Deputy Inspector Edward Brady in both their individual and official capacities. Although not addressed by the parties when a defendant is named in his official capacity, the real party in interest is the governmental entity and not the named official. *Hafer v. Melo,* 502 U.S. 21, 25 (1991). In addition, "[i]n this Circuit, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004)(internal quotation marks and citation omitted).

persuasive justification" for conferring such preferential treatment. *Mississippi v. Hogan,* 458 U.S. 718, 724 (1982). In other words, this policy, which classifies individuals on the basis of gender, must serve" important governmental objectives" and "the discriminatory means employed" must be "substantially related to the achievement of those objectives. *Id.* (citing *Wengler v. Druggists Mutual Ins. Co.,* 466 U.S. 142, 150 (1980)).

In order to determine the governmental objective, the court begins its analysis with Congress' passage of the Pregnancy Discrimination Act (PDA). The *California Federal Savings & Loan Ass'n v. Guerra,* 479 U.S. 272 (1987), cited by both parties in their memorandum, discusses Congress' intent when it passed the PDA. In *Guerra,* the Supreme Court determined that a California state law that preferentially gave pregnant women a right to reinstatement and disability time off to be consistent with the goal of Title VII, as amended by the Pregnancy Discrimination Act of 1978.[9] The Supreme Court noted that:

> The Reports, debates, and hearings make abundantly clear that Congress intended the PDA to provide relief for working women and to end discrimination against pregnant workers.

*See Guerra,* 479 U.S. at 285-86. In determining whether the California law, which provided favorable treatment of pregnancy, was inconsistent with the purpose of the PDA, the Supreme Court stated

> [T]he legislative history is devoid of any discussion of preferential treatment of pregnancy beyond acknowledgments of the existence of state statutes providing for such preferential treatment.

---

[9]The The Ninth Circuit noted that the "PDA does not require states to ignore pregnancy. It requires that women be treated equally." 758 F.2d 390, 396 (9th Cir. 1985). The Circuit rejected the employer's claim that the state statute was preempted by Title VII because it discriminated against male employees, who the court noted did not get pregnant or suffer a consequent diminution in their disability package.

>                         *       *       *
>
>     [I]f Congress had intended to prohibit preferential treatment, it
>     would have been the height of understatement to say only that
>     legislation would not *require* such conduct. It is hardly
>     conceivable that Congress would have extensively discussed only
>     its intent not to require preferential treatment if in fact it had
>     intended to prohibit such treatment. We also find it significant that
>     Congress was aware of state laws similar to California's but
>     apparently did not consider them inconsistent with the PDA.

*See Guerra,* 479 U.S. at 285-87.

The Supreme Court then emphasized the limited nature of the benefits provided in the California law stating:

> The statute is narrowly drawn to cover only the period of actual
> physical disability on account of pregnancy, childbirth or related
> medical conditions. Accordingly, unlike the protective labor
> legislation prevalent early in this century, [the statute] does not
> reflect archaic or stereotypical notions about pregnancy or the
> abilities of pregnant workers.

*See Guerra,* 479 U.S. at 290. It is with reference to this latter portion of the holding that Wahl argues that the maternity leave policy cannot survive constitutional muster because it is not narrowly tailored, and thus, not substantially related to the objectives of the PDA. Wahl further contends that the policy is based only on inaccurate presumptions about women. The court does not agree.

The only arguable preferential benefit afforded pregnant women is the ability to use their accrued sick time before being taken off the payroll. The amount of time that men and women can take off is the same. Wahl's argument is essentially that men and women should both be permitted to charge this time to sick leave arguing that women may be perfectly capable of working after giving birth. This argument completely ignores the fact that childbirth involves a mediacal procedure with attendant complications and time for recovery. The County's

13

determination to permit only pregnant officers to use their sick time in these circumstances is thus justified by the medical procedure they undergo. Non-conceiving parents (both men and women), on the other hand, are treated the same. The CBA contains numerous provisions that address the need for police officers to be mentally and physically fit when they provide services to the public, and the accrued sick time benefit contained in the maternity leave policy is consistent with that gender equal view. Accordingly, notwithstanding Wahl's conclusory allegations concerning the physical ability of his fellow female police officers during and after their pregnancies, the court must conclude that the maternity policy is substantially related to the goal of ending discrimination against pregnant workers and creating employment equality.

## C. Wahl's Family Medical Leave Act Claim

"The FMLA provides that an eligible employee . . . is entitled to twelve workweeks of leave during any twelve-month period. An employee who takes FMLA leave "shall be entitled, on return from such leave . . . (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position . . . ." If, however, an employee after twelve weeks of leave is unable to return to work, the employee no longer has the protections of the FMLA and must look to other sources for any relief or protections. To bring a successful action under the FMLA, an employee must show (1) that the employer interfered with, restrained, or denied the rights protected by the FMLA, and (2) that the employee has been prejudiced by the violation." *See Roberts v. Health Ass'n,* 2009 U.S. App. LEXIS 1944 *2 (2d Cir. Feb. 3, 2009)(internal citations omitted). The record is clear that Wahl was aware that he could take a leave under the FMLA and have his time deducted from his unused vacation time having been so advised when he first sought a maternity leave in 2000. *See*

Termini Aff. at Ex. C. Wahl chose not to take the FMLA leave because he wanted to use accrued sick time. Accordingly, there is no support for his claim that he was denied rights under the FMLA.

## D. Wahl's First Amendment Retaliation Claim

Wahl claims that the defendants have retaliated against him for exercising his First Amendment right to complain about the discriminatory policy.[10] To establish a First Amendment retaliation claim under § 1983, Wahl must initially demonstrate (1) that his speech addressed a matter of public concern[11]; (2) that he suffered an adverse employment action; and (3) that a causal connection existed between the speech and the adverse employment action, "so that it can be said that his speech was a motivating factor in the determination." *See Mandell v. County of Suffolk,* 316 F.3d 368,382 (2d Cir. 2003)(quoting *Morris v. Lindau,* 196 F.3d 109-10 (2d Cir. 1999)(internal citations omitted)). If Wahl can produce evidence supporting these three elements, the defendants can, nonetheless, prevail on their motion for summary judgment based on two different rationales. First, the defendants can prevail by demonstrating that they would have taken the same adverse action in the absence of the protected speech. *See Cotarelo v. Village of Sleepy Hollow Police Dep't.,* 460 F.3d 247, 252 (2d Cir. 2006). Alternatively, the

---

[10] Although the court has determined that Wahl's rights were not violated under the FMLA, Wahl could nonetheless bring a claim for FMLA retaliation. The court notes that the third and fourth elements for an FMLA retaliation claim are similar to the First Amendment retaliation standards and can therefore be addressed together.

[11] Although a public employee "does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment," these rights are not absolute. *Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003) (citing *Connick v. Myers*, 461 U.S. 138, 140 (1983)). Courts are often called upon to balance the interest of the employee in commenting on matters of public concern against the interest of the public employer in promoting the efficiency of the services it performs through its employees. *See Morris v. Lindau*, 196 F.3d 102, 109-10 (2d Cir. 1999).

defendants can show that the employee's speech was likely to sufficiently disrupt government activities so as to outweigh the First Amendment value of the plaintiff's speech. *Locurto v. Guiliani,* 447 F.3d 159, 172 (2d Cir. 2006).

The question of "[w]hether an employee's speech addresses a matter of public concern is a question of law for the court to decide." *Lewis v. Cowen,* 165 F.3d 154, 163 (2d Cir. 1999). "A matter of 'public concern' is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication.'" *Hodge v. City of Long Beach,* 2010 U.S. Dist. LEXIS 138344 *48 (E.D.N.Y. Dec. 28, 2010)(citing *Piscottano v. Murphy,* 511 F.3d 247, 270(2d Cir. 2007)). "'The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" *Id.* at * 50 (citing *Ruotolo v. City of New York,* 514 F.3d 184, 189 (2d Cir. 2008). Here, the defendants argue that Wahl's "complaint (request)" was not a matter of public concern because it was a request for a maternity leave using accrued sick time made pursuant to his official duties and responsibility as a police officer. Wahl contends that his complaint was about what he perceived to be a system-wide discriminatory maternity leave policy, not a request for leave, and thus, the court will for the purposes of this analysis treat it as a matter of public concern. *See Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 143 (2d Cir. 1993).

The court next looks to whether the defendants took any adverse action against Wahl. As stated above, one of the elements that a plaintiff must prove on a First Amendment retaliation claim is that the defendant took some adverse action against him. *Davis,* 2003 U.S. App. LEXIS 13030 at *13 (2d Cir. Feb. 10, 2003). Not every unpleasantness, however, is an adverse action

for constitutional purposes. "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir. 2001). "Otherwise, the retaliatory act is de minimis and therefore outside the ambit of constitutional protection." *Id.*

      Here, Wahl alleges that he was subjected to adverse action in the following ways:

> (1) on March 16, 2007, his tour was changed from steady midnights to less desirable rotating tours, which resulted in a pay reduction of $4,438;
>
> (2) on May 30, 2007, he was subjected to an Internal Affairs interview regarding his use of sick time between March and June 2007;
>
> (3) in June 2007, he was given less advantageous work tasks which required him to walk in 90 degree weather for three days in a row;
>
> (4) on June 15, 2007, he was notified that he need to be evaluated for fitness by a police surgeon;
>
> (5) on August 9, 2007, he was suspended and served with charges accusing him of conduct unbecoming an officer;
>
> (6) the Notice of Charges was taped to the front door of his home for his neighbors to see rather than personally delivered; and
>
> (7) in December 2007, his union representative informed him that defendant Dormer said he "was a cancer to any place we put him" and wanted him gone.

Although the court is unable to conclude that an ordinary individual would have been deterred from the exercise of his or her constitutional rights by all of the alleged actions, at least two of the actions, namely, Wahl's tour change which resulted in less pay and his suspension, are clearly adverse employment actions which would satisfy the second element of the First Amendment

17

retaliation claim. Accordingly, the court now turns to the crux of the analysis, that is, whether a causal connection existed between the speech and the adverse employment action.

As noted earlier, to prevail on a claim of first amendment retaliation, a plaintiff must establish a causal connection between his speech and the adverse action, "so that it can be said that his speech was a motivating factor in the determination." *Morris v. Lindau,* 196 F.3d at 110. A plaintiff can establish the causal connection between the protected activity and the adverse action directly by evidence of retaliatory animus directed against the plaintiff or "indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Wood v. Enlarged City Sch. Dist.,* 473 F. Supp. 2d 498 (S.D.N.Y. 2007)(*quoting Raniola v. Police Commissioner William Bratton,* 243 F.3d 610, 626 (2d Cir. 2001).

With respect to the use of indirect proof that is based on a "showing that the protected activity was closely followed in time by the adverse . . . action," there is no bright-line rule for weighing the import of such evidence. *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554-55 (2d Cir. 2001). And, although the plaintiff's initial burden is "a light one, usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement," (*Raniola v. Bratton,* 243 F.3d 610, 624 (2d Cir. 2001), "proximity in time alone will not support a finding (as opposed to making out a minimal prima facie case) that a plaintiff has proved a causal connection between protected activity and an adverse . . . action." *Das v. Our Lady of Mercy Med. Ctr,* 2002 U.S. Dist. LEXIS 7771, *36 (S.D.N.Y. Apr. 30, 2002).

Here, there is no question that Wahl can show a temporal proximity between the March 2007 complaint and the alleged adverse actions, nonetheless, Wahl's claim must be dismissed. Wahl's tour change may have occurred two days after he submitted his complaint, but it also occurred three weeks after Wahl was counseled for the fourth time in under two years regarding

the abuse of sick time.  While Wahl suggests that he was given no explanation "for this sudden" transfer, there was nothing sudden about it.  Wahl had just been transferred to the First Precinct due to his excessive absences and there is ample proof in the record that when Wahl continued to take time off after his transfer, Inspector Cassagne reassigned him to the two tour shift from steady nights because the two tour shift has more posts with more cops so his absences would be easier to fill.  *See* Termini Aff. at Ex. L

Similarly, while the Internal Affairs Investigation may have been commenced two months after Wahl submitted his complaint, the defendants argue that the "cause" of the investigation was Wahl's continued misuse of sick time, and the court agrees that the only reasonable inference to be drawn from the record is that the investigation and ultimate suspension were inevitable given his abysmal attendance record.  The defendants had expressed their concern about Wahl's use of sick time for two years preceding the adverse actions, and therefore, the court cannot draw an inference from the temporal proximity between Wahl's complaint and the adverse actions, where the acts leading to the actions began long before Wahl complained about the policy in March 2007.  *See Ayiloge v. City of New York,* 2002 U.S. Dist. LEXIS 11807 at *39-40 (S.D.N.Y. June 27, 2002) and cases cited therein (where process leading to alleged adverse action started months before action, courts would not draw inference of discrimination despite evidence of temporal proximity); *Nielsen v. New York City Dep't of Educ.*, 2009 U.S. Dist. Lexis 8866 (E.D.N.Y. Feb. 4, 2009)(no causation where instructions for job improvement in evaluations that formed basis of termination given to plaintiff before he made complaint); *Rothenberger v. New York City Police Dep't*, 2008 WL 2435563 (E.D.N.Y. June 16, 2008) (retaliation claim dismissed where plaintiff received  "below standards" evaluations before he filed his EEOC charge).

Moreover, even when a plaintiff can show that "protected speech was a 'motivating

factor' in an adverse employment decision," the defendant "still prevails by showing that it would have reached the same decision in the absence of the protected conduct." *Id.* (citing *Mount Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 287 (1977) (defendant can avoid liability by showing "by a preponderance of the evidence that it would have reached the same decision as to [the action] even in the absence of the protected conduct"); *see also Texas v. Lesage,* 528 U.S. 18, 21 (1999) (government can avoid liability in First Amendment retaliation claim by "proving that it would have made the same decision without the impermissible motive"). Here, there is ample evidence from which the court can infer that the defendants would have taken the same steps to combat Wahl's misuse of sick time, whatever their mindset may have been after Wahl submitted his leave memorandum. As such, the First Amendment retaliation claim must also fail.

## RECOMMENDATION

For the foregoing reasons, the undersigned respectfully recommends that the defendants' motion for summary judgment be granted. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of service. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72; *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
February 14, 2011

_____/s/_____
ARLENE R. LINDSAY
United States Magistrate Judge